*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JENNIFER RENEE ECHOLS,

        Plaintiff-Appellee,

v

JULIEN QUINCY-WYCLIFF KABZA, also known
as JULIEN W. KABZA,

        Defendant-Appellant.

UNPUBLISHED
November 9, 2021

No. 355876
Washtenaw Circuit Court
LC No. 13-001271-DM

Before: SWARTZLE, P.J., and SAWYER and LETICA, JJ.

PER CURIAM.

In this custody dispute, defendant, Julien Quincy-Wycliff Kabza, appeals by right the trial court's order awarding sole legal and physical custody of his daughter, NK, to plaintiff, Jennifer Renee Echols. Kabza argues on appeal that the trial court abused its discretion when it ordered a change in custody on the basis of findings that were contrary to the great weight of the evidence, and abused its discretion when it denied his motions to remove Julie Sisson, who functioned as NK's guardian ad litem (GAL), but who was later determined to have been appointed to serve as NK's lawyer-guardian ad litem (L-GAL). Kabza argues that, on the basis of these errors, this Court should reverse the trial court's order changing custody and remand for the reinstatement of the previous custody order. Because we conclude that Kabza has not identified any errors that warrant relief, we affirm.

## I. BASIC FACTS

Kabza and Echols married in 2009. Echols had been totally blind since she was 10 years of age and was more than 27 years younger than Kabza. Testimony established that Kabza and Echols had difficulties in the marriage even before NK's birth. After NK's birth in February 2012, their relationship did not improve.

Echols testified that she left Kabza after an incident that occurred when NK was an infant. Echols said that she moved in the direction of Kabza, who was holding the baby. Echols testified that she put out her arms to help navigate the room. Kabza stated that Echols deliberately threw out her arms. Echols made contact with Kabza, and Kabza called the police. Echols stated that

-1-

Kabza informed her that he was calling the police to teach her a lesson. Echols separated from Kabza and then sued him for divorce in April 2013.

The trial court entered a consent judgment of divorce in September 2013. The judgment awarded the parties shared custody of NK, and the parties exercised approximately equal parenting time. The parties managed to cooperate for a couple years. However, Echols married Mathew Oches, Ph.D., in May 2015, and Echols and Dr. Oches had a daughter in March 2016. After Echols remarried, the parties began to have more intractable parenting disputes.

The trial court initially tried to manage the disputes by referring the parties to the Friend of the Court (FOC). A FOC investigator indicated that both parties were "over reactive to each other" and were difficult to interview. The investigator characterized the parties' situation as "high conflict" and noted that the parties even argued about which direction NK should use when brushing her teeth. The investigator wrote as well that Kabza had involved police officers at various points in the disputes. The investigator found Echols to be credible when she outlined a history of efforts that Kabza had used to control her. Although the parties refused to coparent, the investigator did not believe that the parties' unwillingness to cooperate was so severe that it "trigger[ed] a sole custody award." Accordingly, the investigator recommended that the parties continue to share custody. The investigator did, however, recommend that the court separate the parties' responsibilities.

The parties continued to bring their parenting disputes to the trial court. The trial court appointed a parenting coordinator and, after dismissing the parenting coordinator, appointed Julie Sisson to assist. The court appointed Sisson under MCL 722.24, which governs the appointment of lawyer-guardian ad litem (L-GAL) for a child. However, Sisson initially operated under the assumption that she was serving as a guardian ad litem (GAL). After Kabza became disappointed in Sisson's performance, he repeatedly attempted to have her removed from the case.

In an order signed on September 30, 2019, and entered on October 2, 2019, the trial court determined that the record demonstrated that the parties had an inability to cooperate and make decisions in NK's best interests. The court stated that the order that it signed on March 29, 2019, was set aside as a final order. It further determined that Echols had established proper cause or a change in circumstances sufficient to warrant an evidentiary hearing on whether to change legal custody. Accordingly, it scheduled an evidentiary hearing to determine what custody arrangements would be in NK's best interests.

The trial court held 22 days of hearings from December 2019 to December 2020. On the last day of the hearings, the trial court stated its findings and conclusions orally. The court granted sole legal and physical custody to Echols, but retained equal parenting time with a week-on, week-off schedule. The trial court entered an order consistent with its statements from the bench on December 9, 2020. The trial court discharged Sisson from further service the next day. After the trial court denied Kabza's motion for reconsideration, Kabza appealed in this Court.

## II. CHANGE IN CUSTODY

### A. STANDARD OF REVIEW

Kabza first argues that the trial court made several errors that warrant reversing the trial court's order changing custody. This Court must affirm a trial court's orders and judgments in a custody dispute unless the trial court "made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. A trial court's factual finding is against the great weight of the evidence when the evidence so clearly preponderates in the opposite direction that the judgment amounts to a miscarriage of justice. See *Martin v Martin*, 331 Mich App 224, 234-235; 952 NW2d 530 (2020). The trial court makes a clear legal error on a major issue when it incorrectly chooses, interprets, or applies the law. *Id*. at 235. This Court reviews a trial court's custody decision for an abuse of discretion. *Shulick v Richards*, 273 Mich App 320, 323; 729 NW2d 533 (2006). A trial court abuses its discretion when its decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. See *Martin*, 331 Mich App at 234-235.

### B. THE CUSTODY DECISION AND BACKGROUND LAW

The Legislature provided that trial courts must advise the parties to a custody dispute about joint custody and must consider an award of joint custody at the request of either parent. MCL 722.26a(1). The Legislature defined joint custody to mean an order that provides that the child shall reside alternatively for specific periods with each parent, or that the parents share decision-making authority "as to the important decisions affecting the welfare of the child," or both that the child resides with each parent alternatively for specific periods and that the parents share decision-making authority. See MCL 722.26a(7); but see *Lieberman v Orr*, 319 Mich App 68, 79-80; 900 NW2d 130 (2017) (stating that, although the Legislature did not create the categories "primary physical custody," "joint physical custody," and "joint legal custody," this Court has recognized those categories by implication from MCL 722.26a).

In this case, the trial court's order stated that Echols would have "sole legal and physical custody" of NK, but it also provided that NK would live with Echols and Kabza during alternating weeks throughout the year. The court further set forth an alternating holiday schedule. Under the trial court's order, NK will reside with each parent for approximately one-half the year. The court also specifically stated that Echols would be "the sole decision maker as to all medical and educational appointments/treatments." Although the trial court ordered that NK will reside "alternately for specific periods with each of [her] parents," MCL 722.26a(7)(a), the court nevertheless provided in its order that that would not constitute joint physical custody. Accordingly, the time when NK resides with Kabza constitutes parenting time under MCL 722.27a(1).

On appeal, Kabza first suggests that the trial court erred by considering evidence of events that occurred before March 29, 2019, when considering whether and to what extent to alter the parties' custodial arrangements. Kabza relies on this Court's decision in *Vodvarka v Grasmeyer*, 259 Mich App 499, 501; 675 NW2d 847 (2003), for that proposition.

In *Vodvarka*, this Court did not establish a rule that—when holding a best-interest hearing—trial courts are precluded from considering any evidence concerning events that occurred before the entry of the last relevant custody order. Rather, this Court recognized that, under MCL 722.27(1)(c), a trial court may not hold a best-interest hearing to consider a custody change unless the party requesting the change has established proper cause or a change in circumstances that—if true—would warrant such a change. *Id.* at 508-509 (noting that the moving party has the burden to establish proper cause or a change in circumstances before the trial court can even consider whether the child has an established custodial environment with either parent). This Court then went on to hold that, because a change of circumstances necessarily refers to a change since entry of the last custody order, only changes since the entry of the order are relevant to determining whether there has been a change that would warrant holding a full evidentiary hearing. *Id.* at 514-515.

A careful reading of the decision in *Vodvarka* demonstrates that the Court addressed only the evidence that would warrant a trial court's decision to hold a best-interest hearing; the Court did not address what evidence might be admissible at such a hearing. Therefore, Kabza has not shown that the trial court erred by considering evidence concerning events that occurred before March 2019 when considering NK's best interests. Indeed, as this Court has stated, once a trial court determines that it must hold a best-interest hearing, the court must consider all pertinent and relevant factors on the record as it stands at the time of the hearing. See *Thompson v Thompson*, 261 Mich App 353, 357; 683 NW2d 250 (2004). The trial court did not err when it considered all the evidence relevant to considering NK's best interests under MCL 722.23.[1]

Kabza also implies that a change in legal custody invariably amounts to a change in a child's established custodial environment. The Legislature provided that trial courts may not modify or amend a previous judgment or order "as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). The Legislature indicated that an established custodial environment exists when "the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). A child may have an established custodial environment with both parents if the child looks to both for guidance, discipline, the necessities of life, and parental comfort. See *Rains v Rains*, 301 Mich App 313, 327; 836 NW2d 709 (2013). Not every change in custody or parenting time will affect a child's established custodial environment; if a trial court's change in parenting time does not "change whom the child naturally looks to for guidance, discipline, the necessities of life, and parental comfort, then the established custodial environment will not have changed." *Pierron v Pierron*, 486 Mich 81, 87; 782 NW2d 480 (2010). Whether a change alters the established custodial environment necessarily depends on the underlying facts. See *id.* at 87-89 (observing that the record evidence demonstrated that the proposed changes would at most only affect the established custodial environment in minor ways). As such, a change in legal custody does not automatically constitute a change in the established custodial environment.

---

[1] It should be noted that Kabza has not asserted any claims of error concerning the trial court's decisions to admit or exclude specific evidence.

In this case, the trial court agreed with Echols's contention that her proposed change in parenting time would not alter the established custodial environment. For that reason, it determined that Echols only had the burden to prove that the proposed change was in NK's best interests by a preponderance of the evidence. The record showed that NK looked to both parents for guidance, discipline, the necessities of life, and parental comfort. And, although Echols proposed a substantial change in the parties' physical custody during the school year, the change was not so significant that one might conclude that NK would no longer look to Kabza for guidance, discipline, the necessities of life, or parental comfort, even during the school year. As such, the trial court did not err when it determined that the preponderance standard applied. See *id*. at 87. Nevertheless, the trial court went on to find that Echols established by clear and convincing evidence that a change in custody was warranted. Consequently, even if the trial court erred when it initially determined that the applicable burden of proof was a preponderance, it actually applied the more stringent burden of proof applicable to a change that would alter the established custodial environment.

On appeal, Kabza next argues that the trial court's findings concerning best-interest Factors (b), (c), and (j) were contrary to the great weight of the evidence.

When considering whether and to what extent to award joint custody, the trial court had to consider the best-interest factors enumerated under MCL 722.23. See MCL 722.26a(1)(a). The Legislature determined that, for purposes of the child custody act, the best interests of the child means the "sum total" of the enumerated factors, which were to be "considered, evaluated, and determined by the court." MCL 722.23. The trial court had to state its findings and conclusions for each of the factors stated under MCL 722.23 when rendering its custody determination. See *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 451-452; 705 NW2d 144 (2005). Although the trial court was not required to discuss every "piece of evidence entered" and every "argument raised" by the parties, the record must "be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings." *Id*. at 452. The trial court was not required to give equal weight to each factor; it could consider the relative weight of the factors as appropriate to the circumstances. See *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006).

## C. FACTOR (B)

Under Factor (b), the trial court had to consider the "capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b).

In analyzing this factor, the trial court first summarized the evidence. It noted that it heard "voluminous testimony" about the problems that Kabza either "caused or suffered" with school officials. The court opined that some of the problems were Kabza's "making" and others were "frankly the making of others." The court found that NK's education was "impacted by taking the minor child out of school" and bringing her to school tardy. The court also discussed the evidence involving the school district's decision to temporarily ban Kabza from the school grounds and agreed that there might be grounds for concluding that the school did not afford Kabza due process in doing so. However, the court opined that whether the school properly banned him from the grounds did not resolve whether the school staff had grounds for concern about Kabza's behavior.

The court found that the staff had grounds for concern: "there's certainly been reaction from countless witnesses with regard to their interaction with [Kabza] in such a way that the Court has some pause with regard to this factor." The court further rejected Kabza's claim that all his problems with school staff were the result of Echols spreading false rumors behind his back. The court stated that there was an "absence of specific evidence" that that had been occurring and offered that Kabza's testimony to the contrary was "speculation." After summarizing the evidence and making its findings, the trial court found that Factor (b) favored Echols.

The trial court's findings were supported by the record evidence. There was evidence that Kabza repeatedly had personality conflicts with persons involved in NK's education, and that his behaviors were a significant cause of the conflicts. Testimony and evidence established that Kabza was hypersensitive to behaviors or comments by others that might be perceived as a slight,[2] and that he would react to the perceived slights in a way that was disproportionate to the slight. For example, there was testimony that Kabza was confronted for failing to follow the visitor policies at one of NK's preschools, and that he became irritated with a staffer who took notes during a meeting and whose behavior he perceived to be hostile. Although these events would be minor to an average parent, Kabza refused to speak to the staffer who irritated him and even refused to participate in a conference unless the other teacher left the room. He also abruptly removed NK from her first preschool.

There was evidence as well that Kabza did the very thing that he accused Echols of doing at NK's preschools: he sent e-mails to the staff in which he offered negative information about Echols. His communications included information about the incident when Echols bumped into him while he and Echols were arguing about feeding NK when she was an infant. The fact that Kabza was using an incident in which Echols, who was totally blind, bumped into him—in his view deliberately—years later to poison the staff against Echols permitted an inference that Kabza was the parent who was trying to interfere with Echols's ability to participate in NK's education. There was also evidence that he sent e-mails to the school with similar claims about Echols's new husband, Dr. Oches; indeed, he admitted that he sent e-mails in which he claimed that Dr. Oches had expressed a desire to shoot him, although he clarified that he was careful to note in the e-mail that NK had told him that fact because he did not want anyone to accuse him of "derogation."

The evidence showed that Kabza's behaviors alienated NK's kindergarten teacher, Janice Smith, as well. There was testimony that Kabza communicated with Smith in ways that were demeaning, accusatory, and condescending. He implied that Smith was incompetent when he confronted Smith about her failure to teach NK to read within the first week of kindergarten. Smith related that Kabza dropped off NK and asked whether "his daughter was going to learn to read" because she had not "learned yet." He warned Smith that, "if she wasn't going to learn how to read, then he needed to pull her from the school." Smith replied that it was only the third day of

---

[2] The record showed that Kabza even overreacted in court when he felt slighted. When Kabza repeatedly failed to answer a question with a simple yes or no, Sisson began to restate the question and stated that Kabza "either can't answer or won't answer" the question. Kabza exclaimed: "Sorry; I take umbrage at that." "Yes, I'm taking umbrage; I'm signifying I'm taking umbrage at that question." After expressing his umbrage, Kabza gave Sisson permission to proceed.

school and that she had not yet begun to teach reading. She explained to Kabza that the first month was about learning the routine and socializing. Smith testified that, in her 24 years as an educator, she had never had a parent threaten to take his or her child out of school for a lack of progress on reading in the first week of kindergarten. The evidence showed that Kabza did not accept Smith's explanation and continued to act on his belief that Smith was not properly teaching NK.

There was also evidence that Kabza was a difficult parent who did not want to cooperate with school staff; instead, he wanted to dominate and control the entire educational process. For example, there was evidence that he initially refused to use electronic software to communicate with the school and work with NK at home until after he researched the software, he also expressed a dislike for technology, and refused to read the school newsletter. He also refused to let NK use a backpack; instead, he made her carry a plastic bag on his parenting days. He further told Smith that he did not want the weekly folder or any other "paraphernalia" sent home with NK. He later did an about face and accused Smith of depriving him of valuable information by failing to send home NK's folder. He also told Smith that he did not want NK to color Disney characters or other cartoons, and Kabza opined that Smith was not encouraging NK to meet her full potential as an artist. When Smith tried to incorporate some of Kabza's concerns about art with NK, Kabza lashed out at Smith and accused her of embarrassing and harassing NK using the information that he provided to her. Kabza instructed Smith not to allow NK to bring a quarter on a trip to the farmer's market because he did not want NK to be taught the value of money. He also insisted that Smith greet him every morning by stating, "Good morning, Mr. Kabza," rather than using a general greeting, as Smith did for the other parents. He explained his basis for that request in a message to Smith: "In this way the basic lessons of polite comportment are conveyed in the presence of my daughter and other students and staff." Finally, Kabza felt that NK was being starved of information in kindergarten and demanded that Smith work with her one-on-one.

Kabza also tried to micromanage the school as a whole. He instructed the school that it should get the children to line up faster after recess so that the children would have more time for lunch. And Kabza instructed the principal on changes that he would like to see made to the building. He complained about the need for a sink in the lunchroom, complained about the air conditioning, accused the school of violating the fire code, and asked the school to install lockers. Kabza even sent an e-mail to all the kindergarten parents complaining about the school's handling of a lice outbreak. The school principal testified that she received "stacks" of e-mails from Kabza. She indicated that he sent far more than a normal parent and she indicated that Kabza's e-mails generally involved complaints and "cycled" old issues. None of his e-mails, she stated, were child centered. Because she felt that she could never resolve any issue with Kabza, the principal felt compelled to involve the director of elementary education to help manage the problems with Kabza. The director later reviewed all the e-mails concerning Kabza and Echols to ensure that Echols was not receiving preferential treatment, but Kabza did not accept the results of her review.

There was also evidence that Kabza repeatedly disregarded the school's visitor policy. Indeed, he testified that, on the day of the incident when he picked up NK before Dr. Oches could pick her up, because the staff did not respond when he buzzed the door, he waited until someone else left or entered the school and slipped in after that person. Kabza took offense when Smith pointed out the policy and insisted that he sign in and wait for NK rather than proceeding to her classroom.

There was also evidence that Kabza's communications and behaviors caused Smith to fear for her safety around him. Smith described an incident in which Kabza showed up for an outdoor school event—a fun run—involving the children and began to question Smith about visiting her class to observe her teach. He explained that he wanted to observe her class to see if there was evidence that Smith was teaching NK to read. Smith testified that Kabza would not accept her statement that he needed to schedule the visit with her or with the principal. Instead of letting the matter drop, Kabza went into the school, returned, and told Smith that he had learned that she was not telling the truth. Kabza refused to let the matter drop even after Smith indicated that she no longer wished to have a conversation with him. Kabza made her so uncomfortable that she walked over to a coworker to explain her concerns and eventually ended the fun run early so that she could avoid further confrontations with Kabza.

Kabza's testimony that Smith's fear was unfounded because he never threatened her physically or invaded her personal space was inapposite. The evidence that Smith was so concerned that she ended the event early was evidence that she in fact felt afraid. Moreover, under the circumstances, the evidence permitted an inference that her fear was reasonable. Kabza had already established a history of confrontational, demeaning, and accusatory communications with Smith. There was also evidence that Kabza would not follow school policies designed to ensure the safety of students and staff. On the day of the fun run, Kabza confronted Smith in an open and unprotected space where she had to both supervise the children and deal with Kabza's confrontation. He continued to harangue Smith about his desire to observe her class so that he could collect evidence—presumably evidence that she was, in his view, an incompetent kindergarten teacher—even after going into the school. The totality of the circumstances would make any teacher in Smith's position uncomfortable and might cause a reasonable teacher to fear that the situation could escalate. Kabza's behavior also demonstrated a complete disregard for the students as participants in the fun run. The evidence showed that Kabza placed his desire to confront Smith before the needs of the students.

It was also telling that Kabza's own character witness, James Greenberg, testified that he had known Kabza to criticize others and that he had seen others take offense at the criticism. Greenberg related that Kabza did have "some self-awareness" about that problem. He further related that, when Kabza thinks he has been wronged, he will not let the matter go. Greenberg agreed that Kabza had a tendency to perseverate on the perceived wrong, and he stated that the only way to get out from under the situation would be to agree with Kabza and concede. Greenberg's testimony shed light on the reason for Kabza's treatment of Smith: once he decided that Smith was in the wrong, he would doggedly go after her until she conceded her error. A reasonable person confronted with such an aggressive and irrational response to such minor issues would feel threatened.

The evidence further showed that Kabza repeatedly took NK out of school early so that he could spend more time with her. Kabza claimed that he needed to remove NK early for a dance class and to get tutoring because Smith was not teaching NK to read. He also opined that it was his understanding that the last hour of NK's kindergarten class did not involve educational activities, so he felt that her time would be better served with him. But there was testimony that the school staff made Kabza aware that NK's early departures were adversely affecting her education. The evidence tended to suggest that Kabza had been pulling NK from school to serve his own agenda and not because doing so was in NK's best interests. The evidence similarly

showed that Kabza was responsible for the majority of NK's tardy arrivals even though he lived close to NK's school and Echols lived in another community. Further, the evidence showed that Kabza's behavior was disruptive to the class and sent NK the message that Kabza's preferred activities were more important than attending school.

Kabza testified on multiple occasions that he did nothing to warrant the reaction that he received from Smith and other school officials. He opined that the reactions could only be explained by extraneous influence. More specifically, he claimed that Echols and Dr. Oches must have been spreading negative information to the school staff behind his back. Not one person corroborated Kabza's speculation. Every person questioned about the matter, testified that he or she did not recall Echols or Dr. Oches ever stating anything derogatory about Kabza, and Echols and Dr. Oches both denied ever having done so. The more plausible explanation for the reaction of the various school staffers is that Kabza's abrasive and condescending manner caused the rifts with the school staff.

Kabza also argued that the evidence that he got along well with NK's first- and second-grade teachers was evidence that the claims by Smith and the staff who worked with NK during preschool were unfounded. However, there was testimony that Kabza's behavior only improved after Ann Arbor public schools banned him from the elementary school's campus. A reasonable finder of fact could infer that Kabza adjusted his behavior once he realized that the school would take steps to protect its staff from further harassing behavior, which in turn resulted in better relations with NK's first- and second-grade teachers.

The evidence also showed that Echols and Dr. Oches, by contrast, had good relations with all the educators involved in NK's care. The testimony showed that Echols served as a partner with the educators and was positive and supportive of them.

The evidence supported a strong inference that Kabza created the conditions that led to problems with NK's educators. As the trial court aptly stated in its oral remarks, the primary factor in evaluating the evidence involved the credibility of the witnesses. The court observed that "attitude" was an important factor in determining credibility, and it found that Kabza truly acted as though he "believe[d] that he's superior to everyone around him." The court further stated that Kabza "fail[ed] to understand how" his attitude was "demeaning" to others. The court suggested that it was Kabza's "manner and the tone and the nature of the testimony" that undermined his own credibility. The trial court found it credible that Kabza's demeanor and behavior caused his problems with NK's educators, which impacted NK's education. The trial court also impliedly discounted Kabza's explanations for the rifts. The trial court was in a superior position to evaluate the credibility of the witnesses, and this Court will defer to the trial court's assessment of Kabza's credibility. See *Berger v Berger*, 277 Mich App 700, 707; 747 NW2d 336 (2008).

On this record, it cannot be said that the trial court's findings under Factor (b) were contrary to the great weight of the evidence. See *Martin*, 331 Mich App at 234-235.

## D. FACTOR (C)

Under Factor (c), the trial court had to assess the parties' "capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care

recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c).

The trial court summarized the evidence involving Factor (c) and noted that Kabza's testimony about his income varied from the start of the hearing to the end of the hearing. The court further indicated that there was "no real evidence" to support Kabza's testimony that he earned $13,000 a year. The court next noted the evidence that Kabza was unwilling to provide care for NK by paying half the copays for NK's medical care, to pay for any portion of her health insurance premiums, and his refusal to pay for half of the head lice treatment that NK underwent. The trial court was also persuaded by the evidence that Kabza took NK to the emergency department without timely notifying Echols so that she could be there for NK as well. The court stated that it was "shocked" that Kabza acted in a way that prevented Echols from "even hav[ing] a chance to see, let alone interact with the child in a situation like that." The court found that Kabza's behavior could only be explained as "selfishness." The court opined that, if the roles had been reversed, Kabza would certainly not have agreed that it was in NK's best interests for him to be excluded from the emergency room visit. The court opined that the same was true of the evidence involving Echols's behaviors at the medical clinic. The court then found that, overall, the capacity and disposition to provide for NK was "centered" with Echols.

The overwhelming evidence supported the trial court's finding that Echols had the greater financial resources to provide for NK. The evidence showed that Echols was a stay-at-home mother, but she intended to reenter the workforce after her youngest child reached school age. She also had remarried and her new husband, Dr. Oches, earned more than $58,000 a year and provided for NK's material needs as well as her health insurance. By contrast, the evidence showed that Kabza was living off of savings and money that he obtained from selling his home. There was also no credible evidence that Kabza had a steady source of income.

The evidence also supported the trial court's finding that Kabza was unwilling to support NK when it involved compensating Echols for his share of NK's medical expenses. That evidence permitted an inference that Kabza put his animosity for Echols before NK's medical needs.

Kabza argues that the trial court's findings on this factor were contrary to the great weight of the evidence because the evidence showed that Echols refused to comply with the doctor's recommendations on treating NK's constipation. There was evidence tending to suggest that Echols resisted the doctor's recommendation to use MiraLAX and was not consistent with that treatment after acquiescing to its use. However, this was but one component to be considered under Factor (c), and there was evidence that tended to offset the negative inferences to be drawn from Echols's handling of the constipation issue. There was evidence, for example, that Kabza was overly sensitive to NK's medical issues and that his sensitivity may have been linked to his own medical fears. Additionally, there was evidence that permitted an inference that Kabza misled a doctor about NK's use of fluoride in order to obtain a prescription for fluoride. There was evidence as well that Kabza took NK to a doctor's appointment in order to obtain a note requiring NK's elementary school to keep NK indoors for recess because she had a cold despite being told that cold air does not affect the progression of a cold. Testimony also suggested that Kabza used doctor's visits—especially ones when Echols was not present—as an opportunity to portray Echols as a poor parent to the medical staff, which would then get documented in the medical record. Finally, as the trial court stated in its oral remarks, there was evidence tending to suggest that

-10-

Kabza deliberately failed to notify Echols about emergency room visits in order to prevent Echols from proceeding to the emergency room, which was plainly not in NK's best interests.

Examined as a whole, there was ample evidence to support the trial court's finding that Kabza lacked the disposition to provide for NK; rather, the evidence tended to suggest that Kabza was selective about NK's needs. Even in the area of her medical needs, there was evidence that permitted an inference that Kabza placed his own agenda and fears before NK's best interests. Consequently, the trial court's findings under Factor (c) were not contrary to the great weight of the evidence. See *id.*

## E. FACTOR (J)

For MCL 722.23(j), the Legislature required trial courts to consider the "willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." MCL 722.23(j).

When assessing this factor, the trial court discussed the evidence that Kabza repeatedly relayed negative information about Echols and Dr. Oches to others and that he filed complaints against them with child protective services (CPS) and the police department. The court indicated that the evidence made its decision difficult because it was attempting to determine whether either parent was willing to coparent with the other. The court stated that the most important consideration under this factor was whether either parent was willing to encourage and assist NK with respecting and receiving guidance from the other parent. More specifically, the court felt that it was important that a parent be able to do more than merely ignore the other parent at events; the parent needed to be able to facilitate and encourage a close relationship between the child and the child's other parent. The court found that, on the totality of the record, Echols was "slightly favored" under this factor.

The evidence supported a finding that Echols was more likely to facilitate NK's relationship with Kabza. Indeed, the evidence strongly suggested that Kabza had worked to undermine Echols's ability to parent NK.

As an initial matter, Kabza argues that the trial court erred to the extent that it considered his reports to the police department and CPS against him because the Legislature specifically disallowed courts from considering "negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent." MCL 722.23(j). Contrary to Kabza's contention that he only filed the police reports for informational purposes, the record showed that he made such reports to exercise control over Echols.

There was evidence that Kabza had a habit of filing complaints with the police department under questionable circumstances. For example, the evidence showed that Kabza called the police department when NK was an infant because, in his view, Echols battered him. The evidence showed, however, that there was a dispute about the circumstances of the alleged battery. Echols stated that she and Kabza were arguing about who would feed NK and she put her arms out to navigate closer to where he was. She related that she bumped into Kabza who then informed her that he was calling the police department to teach her a lesson. Setting aside the evidence that the

incident might have involved unintentional contact, which could not support a conviction of battery, see *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005) (noting that a battery is an *intentional* unconsented and harmful or offensive touching), the testimony—even as admitted by Kabza—suggests that Kabza used the police report concerning this incident to harass and control Echols and not out of any concern that Echols actually endangered him or NK.

The record also showed that Kabza filed a police report against Dr. Oches in which he made misrepresentations. Kabza was dismissive of this evidence at the hearing; he explained that he could not be held responsible for the statements that the officers attributed to him because they represented "scribal decisions." Kabza seemed to be suggesting that the officers were either deliberately or negligently misstating the facts that he relayed. It is notable too that there was evidence that Kabza provided copies of police reports at times to various educational personnel, which permitted an inference that he did so in an effort to limit Echols's ability to participate in NK's educational activities—stated another way, there was evidence that Kabza used the police reports to further his own goals and not to protect himself or NK.

As for the police report involving the incidents at the medical clinic wherein Kabza alleged that Echols violently tore NK from his grasp, it is noteworthy that the physician who attended the appointment characterized the incident as one that was uncomfortable, but not one in which NK was in danger. Indeed, the doctor testified that she would have reacted quite differently had she felt that NK was in danger. It is notable too that there was evidence that permitted an inference that Kabza was determined to have NK sit on his lap at that appointment because NK had sat on Echols's lap at the last appointment—that is, there was evidence that Kabza went into the appointment with the intent to teach Echols a lesson on parity in parenting. The evidence further suggested that Echols provided NK with a device that was playing a cartoon even though she knew that Kabza objected to such things. The totality of the circumstances indicated that both Kabza and Echols were being petty and vindictive, which led to an uncomfortable situation. Although Echols clearly bore more blame than Kabza for this incident, the incident did not rise to the level at which anyone was in danger. NK was a child—not an infant—at this appointment, and the only reason that there was any danger at all was because Kabza could not bring himself to be the better parent. Instead, the evidence was that he actively resisted Echols effort to lift NK and set her on the ground, which needlessly aggravated the situation.

There was also evidence that Kabza similarly misused reports to CPS. Out of the six reports that Kabza made to CPS, an investigator testified that the first five were not investigated because they did not meet the threshold for investigation. As for the sixth report involving the claim that Echols improperly left the children unattended at an intersection while she practiced crossing the intersection with her seeing eye dog, the investigator interviewed Echols and Dr. Oches, as well as NK, and closed the investigation within a few days because there were "no concerns." Dr. Oches and Echols both testified about the day they practiced crossing the crosswalk, and they both indicated that NK and her younger sister were never in any danger. The CPS investigator's testimony permitted an inference that Kabza's reports, including the last report, were all meritless.

Taken together, the evidence strongly indicated that Kabza misused police reports and reports to CPS to gain an advantage in his disputes with Echols. From that, a reasonable finder of fact could conclude that Kabza's reports were not reasonable and so could be considered against

him under MCL 722.23(j). The trial court did not err to the extent that it used the evidence concerning Kabza's reports against Kabza.

The evidence that Kabza misused police reports and reports to CPS, and used the reports in communications with others to spread negative information about Echols and Dr. Oches, was also evidence that Kabza was unwilling to facilitate a close relationship between NK and Echols. There was evidence as well that Kabza used the Our Family Wizard communication software to harass and belittle Echols as a parent. The evidence showed that Kabza sent an extraordinary number of messages to Echols in which he criticized nearly every aspect of her parenting. Indeed, he sent her more than 50 messages—18 in one day—addressing his COVID concerns. He also admitted that he repeatedly violated the court order limiting him to messages with no more than 10 sentences. Kabza claimed that his messages were not demeaning to Echols, but instead were intended to address legitimate concerns: "In the first place, if nobody speaks, it remains as it is. Since the static situation is full of turmoil on the other side, I'm actually asking that some of the turmoil be addressed." But the record supported an inference that Kabza's accusations were intended to demean Echols as a parent and harass her into complying with his wishes.

Further, although Kabza accused Dr. Oches of interrogating NK in a way that exceeded even the limitations of the Geneva Conventions, there was no evidence that Echols or Dr. Oches routinely questioned NK about Kabza. By contrast, there was evidence that Kabza repeatedly used information that he purportedly obtained from NK to challenge Echols's parenting; he even used information extracted from NK to support his complaints to the police department and CPS. That evidence permitted an inference that Kabza was the parent who routinely interrogated NK to get information that he could use against Echols.

Although the record supported findings that both Echols and Kabza allowed their dislike for each other to interfere with NK's relationship with the other parent, the record amply demonstrated that Kabza had taken the more extreme steps to interfere with Echols' parenting. As such, the trial court's finding that Factor (j) slightly favored Echols was not contrary to the great weight of the evidence. See *Martin*, 331 Mich App at 234-235.

## F. CONCLUSION

Kabza has not identified any errors in the trial court's custody order. Therefore, he has not shown that the trial court abused its discretion when it awarded sole legal and physical custody of NK to Echols. *Shulick*, 273 Mich App at 323.

## III. REMOVAL OF L-GAL

## A. STANDARD OF REVIEW

Kabza next argues that the trial court erred when it denied his motion to remove Sisson as L-GAL and when it failed to appoint a new lawyer to represent NK. This Court reviews de novo whether the trial court properly interpreted and applied the relevant law. *Redmond v Heller*, 332 Mich App 415, 438; 957 NW2d 357 (2020). This Court reviews a trial court's decision on matters committed to its discretion for an abuse of discretion. See *Richards v Richards*, 310 Mich App

-13-

683, 699; 874 NW2d 704 (2015). A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id.*

## B. ANALYSIS

On appeal, Kabza initially states that the trial court transformed Sisson from a GAL to an L-GAL just before the start of the evidentiary hearing to resolve the custody dispute. That assertion does not accurately reflect the record. The trial court appointed Sisson under a consent order in April 2019. Thereafter, the parties and Sisson acted on the assumption that Sisson was serving as a GAL. Indeed, Sisson filed her first report in September 2019, and asserted that she was acting in that capacity. Sisson was critical of Kabza in the report, and even suggested that he directed bullying and intimidation at women. Thereafter, in December 2019, Kabza moved to remove Sisson as the GAL. In response to that motion, the trial court examined the original order and determined that the parties had consented to Sisson's appointment as an L-GAL under MCL 722.24, and not as a GAL. Consequently, the trial court did not transform Sisson from a GAL to an L-GAL—it recognized that Sisson should have been acting as an L-GAL from her first appointment.

The trial court had the authority to appoint Sisson to serve as NK's L-GAL if it determined that her best interests were inadequately represented. See MCL 722.24(2). The events leading up to Sisson's appointment indicated that Echols and Kabza had placed their desire to battle each other before NK's best interests. As such, the trial court could properly conclude that NK's best interests were not being adequately represented by Echols or Kabza, or their lawyers.

On appeal, Kabza argues that the trial court should have removed Sisson as NK's L-GAL because Sisson violated numerous obligations that she had as NK's L-GAL. He complains that Sisson had to file a brief before the trial court commenced the evidentiary hearing, and should have made an opening statement revealing her position so that Kabza could defend against it. Sisson was not, however, the complaining party or an adverse party, so it is not clear that she would have to make an opening statement consistent with MCR 2.507(A). Additionally, lawyers commonly waive opening statements as a matter of trial strategy. See *In re Rogers*, 160 Mich App 500, 503-504; 409 NW2d 486 (1987). Moreover, Sisson owed her duties to NK, not to Kabza, not to Echols, and not even the trial court. See MCL 712A.17d(1); MCL 712A.17d(1)(i). Because Sisson owed her duties to NK, Kabza does not have standing to assert that Sisson's representation did not meet minimum standards of professional representation. See *In re HRC*, 286 Mich App 444, 458; 781 NW2d 105 (2009).

In any event, Kabza did not establish before the trial court that Sisson's decision to reserve judgment about whether it was in NK's best interests to alter the custody arrangement prejudiced him. See, e.g., *In re Osborne (On Remand, After Remand)*, 237 Mich App 597, 603; 603 NW2d 824 (1999) (stating that the appellant bore the burden to prove that a lawyer's representation in violation of the rules of ethics caused him or her prejudice). Although Kabza argued before the trial court that Sisson's failure to make an opening statement or submit a brief prevented him from making his case, it was beyond reasonable dispute that the trial court had to determine whether Echols and Kabza were capable of coparenting and, if not, whether it was in NK's best interests to award sole custody to one parent and alter the applicable periods of physical custody. Given that record, there is no basis for concluding that Kabza would have altered his defense in any material

-14-

way had he known earlier that Sisson was going to argue that it was in NK's best interests to award sole custody to Echols. Indeed, Kabza repeatedly argued that Sisson had aligned herself with Echols's position, and Kabza clearly defended against that position. Consequently, Kabza has not shown that Sisson's failure to earlier reveal her position prejudiced him. See *id*.

Kabza similarly complained that Sisson improperly testified at the hearing. An L-GAL may file a written report to the trial court, which can only be admitted by stipulation of the parties, but may not testify. See MCL 722.24(3); MCL 712A.17d(3). Sisson gave a report to the trial court that included apprising the trial court of recent concerning events that involved NK. It was clear from the context that Sisson was not offering testimony. It is also apparent that the trial court treated Sisson's statement as an oral report and did not accept her statement as evidence. The parties themselves later presented testimony on the issues that Sisson brought to the trial court's attention, which enabled the trial court to determine whether the events identified by Sisson implicated NK's best interests. On this record, Kabza has not shown that Sisson's remarks were improper or prejudiced his hearing. See *In re Osborne*, 237 Mich App at 603.

Kabza also argues that Sisson held a bias against him. Kabza relies heavily on testimony by Kabza's sister to the effect that she felt that Sisson had aligned herself with Echols. He also relies on an expert's testimony that Sisson could have done more to work with the parties, notwithstanding the high-conflict nature of the case. The testimonies of these witnesses did not establish that Sisson held an impermissible bias. The fact that Sisson developed the opinion that it was in NK's best interests to award Echols sole custody and to reduce Kabza's parenting time did not establish an impermissible bias. Judges are required to remain impartial, yet even a judge will not be disqualified from presiding over a case because he or she formed an opinion about the parties after hearing the evidence and observing a party's conduct during the proceedings. See *Cain v Dep't of Corrections*, 451 Mich 470, 495-496; 548 NW2d 210 (1996) (stating that a trial judge will not be disqualified unless his or her bias is both personal and extrajudicial—that is, arising from events outside the proceeding).[3] It was Sisson's duty to investigate the evidence and form an opinion concerning NK's best interests. See MCL 712A.17d(1)(c). The record showed that she did just that; the fact that Sisson ultimately formed an opinion that was contrary to Kabza's position did not by itself establish that she was biased against Kabza. The trial court found that Sisson performed her job properly and declined to remove her. Kabza has not identified any basis for concluding that the trial court abused its discretion when it denied his repeated motions to remove Sisson. See *Richards*, 310 Mich App at 699.

---

[3] Kabza argues on appeal that the rules applicable to judicial disqualification are inapposite because an L-GAL is not a judge. Judicial officers, however, are held to a higher standard than advocates. See Code of Judicial Conduct, Canon 2. As such, if Sisson's conduct would not establish an appearance of impropriety that would warrant disqualifying a judge, it is difficult to maintain that the same conduct would warrant disqualifying an L-GAL who is required to advocate vigorously against a parent whose position the L-GAL believes to be contrary to the child's best interests.

Kabza also briefly claims that the trial court erred when it failed to appoint a new lawyer for NK after it learned that NK wanted to retain equal parenting time with both parents and Sisson believed that it was in NK's best interests to reduce Kabza's parenting time.

Although the child's wishes are relevant to the L-GAL's advocacy, the child's wishes are not controlling. An L-GAL must "make a determination regarding the child's best interests and advocate for those best interests according to the lawyer guardian ad litem's understanding of those best interests, regardless of whether the lawyer guardian ad litem's determination reflects the child's wishes." MCL 712A.17d(1)(i). The L-GAL must also inform the trial court of the child's wishes. MCL 712A.17d(1)(i). Under some circumstances, a trial court may appoint an additional lawyer to represent the child after learning that the child's wishes are inconsistent with the L-GAL's position: "If the court considers the appointment appropriate considering the child's age and maturity and the nature of the inconsistency between the child's and the lawyer-guardian ad litem's identification of the child's interests, the court may appoint an attorney for the child." MCL 712A.17d(2).

On the day set aside for closing statements, Sisson informed the court that NK had within the last week or 10 days expressed a preference for having equal parenting time with both her parents, which position Sisson stated she could not support in good conscience. Although Sisson stated that she did not agree with NK's preference for 50/50 physical custody, Sisson did not completely foreclose that possibility: "And Your Honor, I do not feel that at this time, without some sort of parenting evaluation or psychological evaluation that I referenced in my GAL report, that Mr. Kabza should share 50/50 custody at this point." Given the late stage in the litigation, the fact that the trial court had actually interviewed NK, and the nature of the inconsistent positions, the trial court could reasonably conclude that it was unnecessary to appoint a second lawyer to represent NK's preferences. See MCL 712A.17d(2). Consequently, the trial court's failure to appoint a second lawyer did not fall outside the range of principled outcomes. See *Richards*, 310 Mich App at 699.

Kabza has not shown that the trial court abused its discretion when it denied Kabza's motions to remove Sisson and has not otherwise demonstrated any errors in the trial court's handling of the L-GAL that warrants relief.

IV. CONCLUSION

Kabza has not identified any errors in the trial court's custody decision that warrant any relief.

Affirmed.

/s/ Brock A. Swartzle
/s/ David H. Sawyer
/s/ Anica Letica

-16-